UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| S.H., P.H. and R.H., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:15-cv-0809 |
| | ) | Chief Judge Crenshaw |
| RUTHERFORD COUNTY SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et. seq.*, brought by P.H. and R.H. on behalf of themselves and S.H., their 12 year old daughter. Among other things, S.H. has been diagnosed with Prader-Willi Syndrome. When an Administrative Law Judge dismissed their due process complaint, Plaintiffs filed suit in this Court asserting that Rutherford County Schools ("RCS") denied S.H. the free appropriate public education ("FAPE") required by the IDEA.

On August 1, 2018, after an evidentiary hearing, Magistrate Judge Frensley entered a 33-page Report and Recommendation ("R&R") (Doc. No. 82). In it, he recommended that Plaintiffs' Motion for Judgment on the Supplemented Administrative Record (Doc. No. 68) be granted to the extent it alleged that S.H. was denied a FAPE, and recommended that RCS be ordered to (1) obtain formal training for its staff members who work with S.H. about the best educational practices for students with Prader-Willi Syndrome; (2) thereafter meet with Plaintiffs and develop a mutually agreeable Individualized Education Plan ("IEP") and Behavior Intervention Plan ("BIP") ; and (3) reimburse Plaintiffs' attorney's fees.

Both sides have filed Objections to the R&R. Plaintiffs object on the ground that the R&R

does not recommend residential placement for S.H. at King's Daughter's School ("KDS"), while RCS objects to the majority of the R&R. Having considered the matter *de novo* as required by Rule 72 of the Federal Rules of Civil Procedure, including the record before this Court and the one developed during the administrative proceedings, the Court finds that the R&R appropriately resolves the issues presented and, as such, it will be adopted.

Because the R&R will be adopted, the Objections thereto (Doc. Nos. 87, 88) will be overruled, Plaintiffs' Motion for Judgment on the Administrative Record (Doc. No. 68) will be granted in part, and RCS' Motion to Dismiss (Doc. No. 70) will be denied. Before discussing the specific objections to Magistrate Judge Frensley's recommended resolution, however, a bit of background on the IDEA helps place the parties' arguments in perspective.

## I. Background of the IDEA

The IDEA "offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education' . . . to all children with certain physical or intellectual disabilities." Fry v. Napoleon Cmty. Schs., 137 S.Ct. 743, 748 (2017). An eligible child "acquires a 'substantive right' to such an education once a State accepts the IDEA's financial assistance," id. at 749, and "school districts receiving funds under the IDEA must establish an IEP [Individual Education Program] for each child with a disability," Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 762 (6th Cir. 2001).

The IEP is "[t]he linchpin of the IDEA." Gibson v. Forest Hills Local Sch. Dist. Bd. of Educ., 655 F. App'x 423, 426 (6th Cir. 2016) (citing Honig v. Doe, 484 U.S. 305, 311–12 (1988)). "Every year, an 'IEP Team' comprising an eligible child's parents, her teachers, a representative of the local educational agency, and, whenever appropriate, the child herself, meets to discuss the

2

child's progress and educational goals," and this is formulated into the IEP, which is "a document that evaluates the child's academic achievement and functional performance, as well as her short-term and long-term goals. Id. (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(II), (d)(3)(B). "The IEP also specifies the services that the school will provide to help the child to accomplish her goals, and sets forth the criteria that the IEP Team will use to evaluate the child's progress over the course of the coming year. Id. (citing 20 U.S.C. § 1414(d)(1)(A)(i)(III)–(IV)). The IDEA requires that an IEP be "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982).

The requirement that an IEP be "reasonably calculated to enable the child to receive educational benefits," was recently addressed by the Supreme Court in Endrew F. *ex rel*. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988 (2017). There, the Court wrote:

> The IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement. See §§ 1414(d)(1)(A)(i)(I)–(IV). This reflects the broad purpose of the IDEA, an "ambitious" piece of legislation enacted "in response to Congress' perception that a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to "drop out."'" Rowley, 458 U.S., at 179, 102 S.Ct. 3034 (quoting H.R.Rep. No. 94–332, p. 2 (1975)). A substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act.
>
>       \*                   \*                 \*
>
> [F]or most children, a FAPE will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade. Every IEP begins by describing a child's present level of achievement, including explaining "how the child's disability affects the child's involvement and progress in the general education curriculum." § 1414(d)(1)(A)(i)(I)(aa). It then sets out "a statement of measurable annual goals . . . designed to . . . enable the child to be involved in and make progress in the general education curriculum," along with a description of specialized instruction and services that the child will receive. §§ 1414(d)(1)(A)(i)(II), (IV). The instruction and services must likewise be provided

3

with an eye toward "progress in the general education curriculum." § 1414(d)(1)(A)(i)(IV)(bb).

Id. at 999, 1001.

## II. Parties' Objections

The critical issue in this case is whether S.H.'s Prader-Willi Syndrome – a genetic condition that can affect learning and cause behavioral problems – were met in the Rock Springs Elementary comprehensive development classroom were she was taught. RCS claims they were, while Plaintiffs claims they were not, with the only solution being to provide private placement for S.H. Exercising Solomonic wisdom, Magistrate Judge Frensley effectively chose the middle ground by finding that RCS could provide a FAPE to S.H. with a bit of training and some tweaking of her IEP.

Because RCS' objections cover the waterfront of the conclusions contained in the R&R, the Court finds it appropriate to consider them first.

### A. RCS's Objections

RCS insists it offered an IEP that was tailored to meet S.H.'s unique needs, and which was calculated to enable her to make meaningful progress. In doing so, RCS primarily relies on the testimony from its employees at the due process hearing that generally suggested the following;

- S.H.'s behavioral issues never caused serious injury to staff or students. In fact, Andrea Martz, her special education teacher for nearly six years six years, was pregnant with triplets during a portion of this time and never felt threatened.

- S.H. only sporadically displayed behavioral issues that required redirection from instruction in order for her to calm down. Martz testified that, when necessary, she provided positive behavior interventions "such as a token economy system."

- In the year before the due process hearing, S.H. had only 5 behavioral incidents and, for each, she was able to calm down enough to return to the classroom within approximately 45 minutes.

- While S.H.'s participation in the general education program decreased over time

4

> this, according to Martz, was the result of the content of the studies and the integration of science and social studies into the curriculum.
>
> • Stephen Lewis, the principal of Rock Springs, got along well with S.H. She was rarely sent to his office and he was summoned to her classroom on only six occasions during the six year period she was at the school.
>
> •S.H.'s parents actively participated in the IEP meeting over the years and agreed with each IEP, including the one that was issued immediately prior to the filing of the administrative due process complaint.

(Doc. No. 85 at 5, 10-12).

RCS was so confident at the close of Plaintiffs' proof at the due process hearing that it chose not to put on a case at the hearing. That choice proved successful because the ALJ found entirely in RCS's favor at the close of Plaintiffs' case. While it was certainly within the province of the ALJ as the factfinder to make credibility determinations for those witnesses, this Court's task in reviewing an ALJ's decision is not to accept his or her findings *carte blanche*. Instead, the Court is required to follow the well-established standards under the IDEA for review of administrative decisions.

"The IDEA establishes formal procedures for resolving disputes. A parent or guardian may file a complaint regarding any matter concerning the provision of a FAPE with the local or state educational agency." Sophie G. v. Wilson Cty. Sch., No. 17-6209, 2018 WL 3409208, at *3 (6th Cir. July 12, 2018). Once administrative remedies are exhausted, "any party unhappy with the outcome . . . may seek judicial review by filing a civil action in state or federal court." Id. (citing 20 U.S.C. § 1415(i)(2)(A)).

When reviewing the decision of an administrative agency, a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as

the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). "The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence but also should give 'due weight' to the determinations made during the state administrative process." Deal v. Hamilton Cty. Bd. of Educ., 392 F.3d 840, 849–50 (6th Cir. 2004) (quoting Rowley, 458 U.S. at 206). "Although reviewing courts 'must not simply adopt the state administrative findings without an independent re-examination of the evidence, . . . neither may they 'substitute their own notions of sound educational policy for those of the school authorities which they review." Id. In this regard, the Sixth Circuit has stated that "[l]ess weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation," while "[m]ore weight . . . is due to an agency's determinations on matters for which educational expertise is relevant." N.W. *ex rel*. J.W. v. Boone Cty. Bd. of Educ., 763 F.3d 611, 614-15 (6th Cir. 2014) (citations omitted).

The ALJ issued an oral ruling covering roughly 7-pages of a 490-page transcript. As Magistrate Judge Frensley correctly observed, "the ALJ's discussion of the IEPs from the hearing transcript is general and conclusory; the ALJ appears to assume that the content of each IEP was appropriate." (Doc. No. 82 at 25). In a 2-page Final Order dismissing the case, the ALJ simply found that Plaintiffs failed to present any probative evidence in support of their claim that [RCS] failed to provide a 'free appropriate public education' in the 'least restrictive environment to S.H." (Doc. No. 1-1 at 3).

In arriving at his conclusion, the ALJ effectively rejected the testimony of Elizabeth Roof, a licensed psychological examiner in favor of the testimony from RCS employees. He stated:

> Ms. Ruth's [sic] testimony is that S.H. has Prader-Willi Syndrome and she has behavioral issues and she testified, gave us some definition to that and explanation

6

> of what it means, none of these– none of that description was inconsistent with what I typically hear about Special Needs children. What she didn't add, and I don't know that she was ever qualified to add, was how best to educate S.H. And then whether or not the school had one that or had failed. There is simply no proof.

(Doc. No. 17-4 at 22). After crediting Martz's testimony because of her experience as a special education teacher, the ALJ then stated:

> All of the testimony from the school system is that the I.E.P. is in order and that is consistent with the parent's agreement, the parents have agreed in the past that the I.E.P. is in order. So what I have at this point . . . is that the I.E.P. is in place, that it is adequate and she is making educational progress. There is absolutely no proof in the record otherwise.

(Id. at 22-23).

From a preponderance of the evidence standard, Roof's testimony should not have been summarily discounted. She is a senior research specialist in the Prader-Willi Syndrome Project at the Vanderbilt Kennedy Center and has worked with over 300 individuals with that syndrome and their families since 1995. She has written on the topic, and spoken extensively at professional conferences. More to the point, Roof consults with schools to provide behavioral support and training to staff and students with Prader-Willi Syndrome, and works with medical professionals to help solve behavioral and psychiatric issues for those afflicted with the syndrome. Indeed, she has known S.H. since S.H. was 17 months old, and S.H. participated in two of the studies conducted at the Kennedy Center. Not only that, Roof herself was a teacher for four years (albeit years ago) and regularly communicated with parents about their children, including students with various behavior issues.

At the due process hearing, Roof was presented with educational records, including school notes and agendas about circumstances that happened with S.H. at Rock Springs Elementary. Roof discussed individuals with Prader-Willi Syndrome and their behaviors (including outbursts,

7

aggressive behavior, rectal picking, skin picking, and hunger) and the best methods for handling such behaviors. She explained that people with the syndrome need a lot of individual attention and visual schedules, the absence of which leads to the escalation of bad behaviors including aggression and violence. In short, Roof brought valuable information to that table that should not have been ignored because she provided valuable insight on the best practices for educating students with Prader-Willi Syndrome and why some of RCS's responses – such as a teacher's aide saying, "I'll be with you in a minute" (when students with the condition have no conception of time), or offering food as a reward or withholding it as a punishment (when individuals with Prader-Willi Syndrome are always hungry) – simply would not be effective.

Further, it is unclear whether the ALJ considered any of the 1,500 pages of exhibits in the administrative record, including the IEPs, even though, as previously noted, those documents are IDEA's "linchpin." Indeed, RCS's expert, Dr. David Rostetter, who testified at the evidentiary hearing before Magistrate Judge Frensley, conceded that "[t]he basic theory would be if an IEP remains identical or quite similar over five years and the student doesn't grow, then we can probably conclude that the IEP is deficient, if it doesn't make adjustments, as the student develops." (Doc. No. 67 at 28). He then opined that this was not the case regarding S.H. because she made "satisfactory progress." (Id.). After all, he suggested, during the period in question both her reading and reading skills improved such that, by 2015, she was reading as a third grader. This information, of course, came from RCS.

A Vanderbilt Kennedy Center report date March 1, 2015, was hardly as glowing. It indicated that S.H.'s reading ability was that of a first grader, and she could not solve even basic math problems involving simple addition and subtraction

8

Regardless, it is undisputed that S.H. has behavioral issues, yet it was not until the 2015-2016 school year that her IEP indicated that her behavior interferes with her own learning and/or that of other students. Before then, many of the behavioral goals remained unchanged. This remained so, even though during this period daily written notes sent home to S.H.'s parents indicated a lot of "good days" and even some "great" or "excellent"days," but also many instances of "picking" or "scratching" (and the need for band-aids and Clorox wipes), "yelling," "negative behavior," "talking ugly," "being defiant," having a "bad attitude," and urinating in her pants. (Doc. Nos. 17-17, 17-18, *passim*).

From the notes sent home to S.H.'s parents, and the testimony before the ALJ, the Court has no doubt that Martz was earnest in her efforts to address problem behavior. However, and as Plaintiffs point out, the reactive approach used to address behavioral problems reduced instruction time. That is, each time S.H. was placed in a bathroom, sent to the principal's office, sent to the "sensory" room, or walked around hallways was time not spend learning. From the record, and particularly the testimony of Roof, it appears that a lot of the downtime could be avoided by utilizing different techniques, instead of the *ad hoc*, reactive approach (such as using food as an incentive) employed at Rock Springs Elementary.

The Supreme Court in Endrew F. observed that "the progress contemplated by the IEP must be appropriate in light of the child's circumstances," "[a] focus on the particular child is at the core of the IDEA," and "instruction offered must be 'specially designed' to meet a child's 'unique needs[.]'" 137 S.Ct. at 999. That is, "[t]he purpose of the IDEA is to give children with disabilities a free appropriate public education designed to meet their unique needs." Deal, 392 F.3d at 840. The Court agrees with Magistrate Judge Frensley that the record as a whole suggest that S.H.'s

specific needs have not been appropriately met.

To correct the design flaw and insure that S.H. receives the education required by the IDEA, Magistrate Judge Frensley recommended not only formal training on Prader-Willi Syndrome, but also implementation of a mutually agreeable IEP, including a BIP. Defendants object because a BIP is only required when a child is suspended for more than ten days in a school year and that did not occur. This argument misses the mark.

Upon review of an administrative decision under the IDEA, a court is entitled to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). A "court enjoys 'broad discretion'" in "fashioning relief," Florence Cty. Sch. Dist. Four v. Carter By & Through Carter, 510 U.S. 7, 16 (1993), and this includes requiring establishment of a BIP. See Park Hill Sch. Dist. v. Dass, No. 07-6093-CV-SJ-DW, 2009 WL 10681117, at *5 (W.D. Mo. Mar. 31, 2009) (recognizing that a BIP was required by statute where a student faced a suspension of more than ten days, but holding that hearing panel's decision to require a BIP was appropriate where student exhibited behavioral problems that affected other students). Magistrate Judge Frensley was correct that a BIP is a part of the appropriate relief in this case.

Finally, RCS objects to an award of attorney's fees. As it correctly observes:

> The Magistrate Judge's recommendation of awarding attorney's fees to Plaintiffs is a corollary to his finding that Defendants deprived S.H. of FAPE. If this Court finds that Defendants did not deprive S.H. of FAPE, then Plaintiffs would not be considered a prevailing party and thus would not be entitled to an award of attorney's fees.

(Doc. No. 89 at 3 n.2). Of course, the obverse is also true – "[i]n any action or proceeding brought under [the IDEA], the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C.A. § 1415(i).

Although a matter of discretion, "Sixth Circuit case law requires that a district court award attorney fees to a prevailing party where no special circumstances militate against such an award." Wikol ex rel. Wikol v. Birmingham Pub. Sch. Bd. of Educ., 360 F.3d 604, 611 (6th Cir. 2004). Because of his intimate familiarity with this case, the Court will leave it to Magistrate Judge in the first instance to address any fee request filed by Plaintiffs.

## B. <u>Plaintiffs' Objections</u>

Plaintiffs' only objection is that Magistrate Judge Frensley did not recommend that S.H. be placed at KDS. That objection is without evidentiary support.

"The IDEA creates a statutory preference and expressly mandates that handicapped or disabled children be educated in the least restrictive environment to the maximum extent appropriate." Tennessee Dep't of Mental Health & Mental Retardation v. Paul B., 88 F.3d 1466, 1471 (6th Cir. 1996). Thus, "[t]o the maximum extent appropriate, children with disabilities, . . . [must be] educated with children who are not disabled," and separated "only when the nature or severity of the disability . . . is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). "This preference is not absolute, however, and a school may separate a disabled student from the regular class under circumstances when: (1) the student would not benefit from regular education; (2) any regular-class benefits would be far outweighed by the benefits of special education; or (3) the student would be a disruptive force in the regular class." L.H. v. Hamilton Cty. Dep't of Educ., 900 F.3d 779, 789 (6th Cir. 2018) (citing Roncker v. Walter, 700 F.2d 1058, 1063 (6th Cir. 1983)). "To assess whether a residential placement is appropriate, a determination must be made whether full-time residential placement is necessary for educational purposes as opposed to medical, social, or emotional

problems that are separable from the learning process." Paul B., 88 F.3d at 1471.

Plaintiffs have not come close to showing that placement at KDS is necessary to meet S.H.'s educational needs. To the contrary, both Rostetter and Roof indicated that only 1% of students with Prader Willi Syndrome need residential placement, and there is nothing to suggest that S.H. falls within that category. Although a report from Vanderbilt suggests a need for residential treatment to address psychological problems, it does not address S.H.'s educational needs or whether KDS is the solution for those needs.

According to Shauna Jo Bryant, its Executive Director, KDS is a "residential boarding school for students with cognitive impairments" costing $80,000 to $90,000 per year. (Doc. No. 17-3 at 35, 41). Of its approximately 100 residents, only 5 are afflicted with Prader Willi. While S.H. would likely be accepted into KDS, Bryant made clear that she was not advocating for S.H.'s admission. (Id. at 32). Simply put, Plaintiffs have not shown that placement is appropriate within the meaning of 20 U.S.C. § 1415(i)(2)(B), or otherwise equitable. See Knable, 238 F.3d at 771 (noting that district court is to "weigh the equities" and "consider all relevant factors," including reimbursement costs where plaintiff chose to enroll their child in a private school when an IEP was ineffective). The preponderance of the evidence weighs heavily against a finding that S.H. needs residential placement in KDS to meet her educational needs.

In opposing Plaintiffs' request for placement in KDS, RCS relies upon the "colorful metaphor" set forth in Doe By & Through Doe v. Bd. of Educ. of Tullahoma City Sch., 9 F.3d 455, (6th Cir. 1993). There, the Sixth Circuit observed that the IDEA "requires that the . . . schools provide the educational equivalent of a serviceable Chevrolet to every handicapped student. . . it is not required to provide a Cadillac." Id. at 459-60. That metaphor actually applies to the entirety

of this case and not simply Plaintiffs' request that S.H. be placed in KDS. Just as placement there would be the equivalent of a Cadillac, the education presently provided by RCS is not the serviceable Chevrolet contemplated by the IDEA. It can become such a vehicle, however, with the tune-up and implementation of the recommendations made by Magistrate Judge Frensley.

### III. Conclusion

On the basis of the foregoing, and having fully considered all of the arguments raised by the parties, the R&R will be accepted and approved in its entirety, and the objections thereto will be overruled.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE